Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| WILLIAM D., individually and on behalf of S.D., a minor.<br><br>          Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, and the FORTIVE CORPORATION & SUBSIDIARIES MEDICAL PLAN.<br><br>          Defendants. | COMPLAINT<br><br>Case Number 2:19-cv-00590 DB |

Plaintiff William D. ("Bill") individually and on behalf of S. D. ("S.") a minor, through his undersigned counsel, complains and alleges against Defendants United Healthcare Insurance Company ("United") and the Fortive Corporation & Subsidiaries Medical Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Bill and S. are natural persons residing in Snohomish County, Washington. Bill is S.'s father.

1

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the third party claims administrator for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Bill was a participant in the Plan and S. was a beneficiary of the Plan at all relevant times. Bill and S. continue to be participants and beneficiaries of the Plan.

4. S. received medical care and treatment at Solstice West ("Solstice") from May 19, 2017, to April 5, 2018. Solstice is a licensed residential treatment facility located in Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. United, acting in its own capacity, or through its subsidiary and affiliate United Behavioral Health, or under the brand name Optum, denied claims for payment of S.'s medical expenses in connection with her treatment at Solstice. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Bill for the medical expenses he has incurred and paid for S.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah and has a claims processing center there, and because the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### S.'s Developmental History and Medical Background

9. S. seemed like a normal happy child growing up. She was easygoing and outwardly appeared to be doing well. Then shortly after she turned thirteen, she attempted suicide by overdose and by cutting herself on August 24, 2015. She was subsequently hospitalized for a period of about two weeks.

10. S. attributed the attempt to anxiety and depression, coupled with continuous back pain and an argument with her mother. Bill discovered that her cutting had been ongoing for some time and that she had previously attempted suicide a few months earlier by attempting to hang herself.

11. S. began counseling and was placed on a medication treatment plan as well. Initially this seemed to work well, although S. became increasingly withdrawn. In April of 2016, S. learned that her grandfather had been diagnosed with lung cancer. S. was indifferent to the news, but then shortly afterward expressed a desire to go back to the hospital. No beds were available and so she started treatment in an outpatient treatment program, but this was then shortly discontinued as it was largely ineffective.

12. In June of 2016, S. revealed to her counselor that she had been sexually abused by her grandfather when she was four to six years old. After this was discovered, S. was immediately hospitalized at Fairfax Hospital. Bill was contacted by child protective services but no further action was taken after an agreement was reached that the grandfather would have no further contact. On June 29, 2016, while she was still hospitalized, S. attempted to commit suicide through strangulation. Hospital staff intervened and S. was then placed on 24 hour suicide watch.

13. After S. was determined to no longer be an active suicide risk, she was discharged from the hospital with the recommendation for continued care. With assistance from family, Bill kept S. under 24-hour supervision while he looked for a long-term care facility. He enrolled S. in a facility in Arizona. The day after Bill returned home he was informed by the facility that S. had refused to sign a safety contract and would not commit to not attempting suicide, she was then transferred to an urgent care facility in Arizona. While at this facility S. disclosed that, in addition to her other known attempts, she had attempted suicide by overdose multiple times in the last few years.

14. S. was then transferred to an inpatient treatment center in Nevada called Willow Springs Center, where she was treated from August of 2016 to November of 2016. S.'s behavior improved while she was in treatment, but the program only focused on surface level issues and did not delve into the root of her trauma. As soon as S. left the program she quickly regressed.

15. S. started to attend a public high school, but after only two days she became overwhelmed and depressed and stopped attending. Bill then enrolled her in an alternative school, but this only lasted a few months, as she continued to struggle and had

a particular aversion to being around men. She was then enrolled in a Montessori School. This intervention also failed and S. stopped talking entirely for a period of several weeks. Her depression became so bad that there were many days that she couldn't get out of bed. S. started acting like she had when she was suicidal and Bill again began monitoring her for 24 hours a day. Shortly afterward she was admitted to Solstice.

**Solstice**

16. S. was admitted to Solstice on May 19, 2017, with United's approval.

17. In a letter dated July 17, 2017, United denied payment for S.'s treatment at Solstice from July 10, 2017, forward. The reviewer gave the following justification for the denial:

> …Your child was admitted for treatment of depression. After talking with your child's doctor's designee, it is noted your child has made progress and that your child's condition no longer meets Guidelines for further coverage of treatment in this setting. She is no longer endangering the welfare of herself or others. She is able to understand and participate in her care. She is attending groups and taking medications as prescribed. Her acute suicidal thoughts have resolved. No recent medication changes have occurred. She does not appear to require 24 hour nursing care and supervision for her remaining symptoms and can continue her recovery in a less restrictive setting. Your child could continue care in the Mental Health Intensive Outpatient Program setting. …

18. On January 10, 2018, Bill submitted a level one appeal of the denial of S.'s treatment at Solstice. Bill pointed out United had initially approved S.'s care. He argued that S.'s condition did not suddenly drastically change on the morning of July 10, 2017, so that she was ready to be discharged. He wrote that her treatment remained medically necessary and had been repeatedly recommended by S.'s treating professionals.

19. Bill requested that in the event that United upheld the denial that it provide him with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, the Plan's mental

health and substance use criteria, the Plan's criteria for skilled nursing and rehabilitation facilities, and any reports from any physicians or other professionals regarding the claim. (collectively the "Plan Documents")

20. In a letter dated February 12, 2018, United upheld the denial of payment for S.'s treatment. The reviewer wrote in part:

> The non-coverage determination for residential level of care will be upheld on 07/10/2017 and forward. This is based on Optum Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. Your daughter was doing better. She was working hard. She had made good progress. She was cooperative. She was not wanting to harm herself or others. It seems that her care could have continued in a less intensive setting.

21. On August 6, 2018, Bill submitted a level two appeal of the denial of S.'s treatment at Solstice. He stated that S. was "constantly in and out of acute care hospitals and intensive outpatient programs" but that it was only after she finished her treatment at Solstice that she was able to get the care that she needed.

22. Bill included an updated copy of S.'s medical records with the appeal. These records showed that S. had Post-traumatic Stress Syndrome and continued to struggle with the trauma of her sexual abuse, which was exacerbated by her depression and anxiety.

23. He wrote that "all of [S.]'s treating physicians believe residential treatment was medically necessary to treat her debilitating behaviors." To illustrate this, Bill included a letter of medical necessity dated May 14, 2018, from Trampas Rowden Ph.D., CMHC, which stated in part:

> It is my opinion and that of our treatment team that intensive residential intervention was indicated and necessary to address [S.]'s presenting problem areas in their complexity and nuance. If she and her parents maintain gains resulting from her treatment efforts while here, it is anticipated that [S.] will continue improving emotional regulation, self-care, and interpersonal skills necessary to sustaining and expanding her personal growth and prosocial success.

It is recommended she continue to engage in and utilize post-discharge transition support services to assist her in establishing a longer-term trajectory of success.

24. Bill alleged that his ERISA rights had been violated and he had not been given a full, fair, and thorough review. He asserted that the previous reviewer did not possess the necessary qualifications necessary to review S.'s treatment, as the reviewer specialized in general psychiatry and substance abuse. He pointed out that S. did not have a substance abuse problem and questioned why United would have assigned a reviewer with this specialization to evaluate S.'s treatment, instead of a reviewer that specialized in child and adolescent psychiatry.

25. He claimed that United's denial was in violation of MHPAEA, as under MHPAEA, United must offer mental health benefits "at parity" with comparable levels of medical and surgical services covered by the Plan. He wrote that because the Plan offered coverage for intermediate level medical or surgical care such as treatment in a skilled nursing facility, its denial was likely in violation of MHPAEA.

26. He wrote that MHPAEA prohibited plans from imposing non-quantitative treatment limitations on behavioral health benefits that were not also applied to comparable medical or surgical benefits. He asserted that United imposed requirements such as acute symptomology for S.'s treatment which was not a condition for treatment in comparable levels of medical or surgical care such as rehabilitation or skilled nursing facilities. He argued that these acute requirements would be akin to requiring someone to actively be experiencing a heart attack in order to receive skilled nursing care.

27. He requested that if United felt that the Plan was compliant with MHPAEA, that it explain to him in detail why this was so. He pointed out that United's criteria for both acute inpatient care and sub-acute residential treatment both required acute

symptomology according to United's Optum Level of Care Guidelines. He argued that this was concerning as it not only contradicted United's own definition of a residential treatment center as a sub-acute level of care, but that residential treatment centers were not "intended nor equipped to handle patients exhibiting these kinds of acute symptoms."

28. He argued that requiring acute symptomology for a sub-acute level of care was far outside the norms of generally accepted medical practice. He expressed concern and called it disreputable that United required acute severity of symptoms for both acute and non-acute levels of care when they were not interchangeable services.

29. Bill requested that United address each of his concerns individually in its response, and he again requested to be provided with a copy of the Plan Documents.

30. In a letter dated October 9, 2018, United upheld the denial of payment for S.'s treatment. The reviewer wrote in part:

> Based on the Optum Level of Care Guideline for the MENTAL HEALTH RESIDENTIAL TREATMENT CENTER Level of Care, it is my determination that that [sic] no further authorization can be provided from 7/10/17.
>
> Your child was admitted for treatment of problems with her mood. After reviewing the available information, it is noted your child had made progress and that your child's condition no longer met Guidelines for further coverage of treatment in this setting. She was doing better. She was stable from a medical and mental health standpoint. She was participating in treatment. She had family support. She was able to take care of her needs. She did not require 24-hour nursing care. Your child could have continued care in the MENTAL HEALTH OUTPATIENT setting.

31. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

32. The denial of benefits for S.'s treatment was a breach of contract and caused Bill to incur medical expenses that should have been paid by the Plan in an amount totaling over $120,000.

33. United failed to provide Bill with a copy of the Plan Documents, including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of Bill's requests.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

34. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

35. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

36. United and the agents of the Plan breached their fiduciary duties to S. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in S.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of S.'s claims.

37. The actions of United and the Plan in failing to provide coverage for S.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

//

9

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

38. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

39. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

40. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

41. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

42. Specifically, the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or restrictive than the medical necessity criteria applied to intermediate level medical or surgical benefits.

43. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for S.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation

10

facilities. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner United excluded coverage of treatment for S. at Solstice.

44. The actions of United and the Plan requiring that S. satisfy acute care medical necessity criteria in order to obtain coverage for residential treatment violates MHPAEA because the Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

45. Specifically, in its review of S.'s claims, United utilized acute criteria such as S. "not wanting to harm herself or others" to evaluate the non-acute level of care that S. was receiving. In addition, United's reviewers listed factors such as "your child had made progress" and "She was participating in treatment. She had family support. She was able to take care of her needs" as reasons to deny treatment. These factors serve as indicators, rather than contra-indicators of the medical necessity of treatment in a non-acute residential setting.

46. The actions of United and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

47. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. United and the Plan evaluated S.'s mental health claims under a more restrictive standard than generally accepted standards of medical practice. This process resulted in a disparity where equivalent mental health benefits were denied when the analogous levels of medical or surgical benefits would have been paid.

48. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

49. United and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiffs' allegations that United and the Plan were not in compliance with MHPAEA.

50. The violations of MHPAEA by United and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and United insured plans as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

51. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for S.'s medically necessary treatment at Solstice under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 22nd day of August, 2019.

By   ___s/ Brian S. King_____
              Brian S. King
              Attorney for Plaintiffs

County of Plaintiffs' Residence:
Snohomish County, Washington.